Andrew L. Morrison
Samantha J. Katze
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 536-3900
Fax: (212) 536-3901
andrew.morrison@klgates.com
samantha.katze@klgates.com

**11 CIV 9115**



Attorneys for Plaintiff Cydcor, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                                        :
CYDCOR, INC.,                                           :       Civil Action No.
                                                        :
                                Plaintiff,              :
                                                        :       **COMPLAINT**
        - against -                                     :
                                                        :       **JURY TRIAL DEMANDED**
CREDICO MARKETING INC., DEREK                           :
COLANTONIO, RAFAEL DIAZ,                                :
                                                        :
                                Defendants.             :
-----------------------------------------------------------X

        Plaintiff, Cydcor, Inc. ("Cydcor") by its attorneys, K&L Gates LLP, for its complaint

against Credico Marketing Inc. ("Credico"), Derek Colantonio ("Colantonio") and Rafael

Diaz ("Diaz") hereby alleges:

### INTRODUCTION

        1.      Cydcor has commenced this action to recover an amount to be determined at

trial but, in no event, less than $75,000 as damages plus punitive damages caused by the

tortious acts and unfair competition of Credico and its representatives, Colantonio and Diaz.

### PARTIES

        2.      Plaintiff Cydcor is a Delaware corporation with its principal place of business

located at 3011 Townsgate Road, Suite 400, Westlake Village, California.

3.     Defendant Credico is a Canadian corporation with its principal place of business located at 100 Boulevard Alexis-Nihon, Suite 105, Montreal, Canada.

4.     Defendant Colantonio is domiciled in the State of Georgia with an address at 3358 Trails End Circle Northeast, Roswell, Georgia.  Colantonio works for and on behalf of defendant Credico.

5.     Upon information and belief, defendant Diaz is domiciled in the State of New Jersey with an address at 518 Gregory Avenue, Apt. A409, Weehawken, New Jersey. Defendant Diaz's actual place of business is located at 1350 Broadway, Suite 1612, New York, New York.

## JURISDICTION

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), (a)(2) and/or (a)(3) because (1) the matter in controversy exceeds $75,000; and (2) Cydcor is a citizen of California and Delaware and (a) Credico is a citizen of Canada; (b) Colantonio is a citizen of the State of Georgia; and (c) Diaz is a citizen of the State of New Jersey.

## VENUE

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) and (3) because defendant Diaz maintains his actual place of business in New York, and the acts giving rise to this complaint occurred within this District.

## FACTUAL BACKGROUND

8.     Cydcor is a sales and marketing company that, among other things, provides outsourced sales teams for clients who provide goods and services to be sold to consumers and/or businesses in industries such as telecommunications, energy and office supplies. These clients provide Cydcor with their respective sales programs.  Cydcor, in turn, sends these programs to its independent corporate licensees ("ICLs") who provide sales teams to

market the particular goods or services in a defined geographical region.  Cydcor receives a commission from its clients based upon the ICLs' sales volumes, which is then shared with the respective ICLs and their individual sales teams.

9.      The relationship between Cydcor and its respective ICLs located throughout the United States is governed by a written contract called an Outsource Sales License Agreement (the "License Agreement").  In addition, Cydcor distributes a best practices manual to its ICLs that is incorporated by reference and made a part of the terms of the License Agreement.  A copy of defendant Diaz's License Agreement is annexed hereto as Exhibit "A."

10.     The individuals who own the respective ICLs personally guarantee in writing that their ICL will comply with the terms of the License Agreement.  A copy of defendant Diaz's personal guarantee is part of the License Agreement that is attached hereto as Exhibit "A."

11.     Cydcor encourages ICLs to recruit ethical and enthusiastic salespeople.  These individuals, to the extent that they achieve certain performance milestones, have an opportunity to incorporate their own ICL and execute a License Agreement with Cydcor.

12.     Accordingly, an experienced ICL owner, such as defendant Diaz, can "promote" several new ICLs and those ICL owners can, in turn, promote their own new ICLs.  Cydcor monitors these lines of promotions and each ICL earns an override on the commissions earned by the ICLs that it has promoted.

13.     Defendant Diaz owns an ICL named Universal Marketing and Consulting, Inc. which does business as New York Business Partners.  Diaz's ICL is located at 1350 Broadway, Suite 1612, New York, New York.

14.     Defendant Diaz directly or indirectly promoted approximately 20 other ICLs that entered into License Agreements with Cydcor from which he earned overrides (the "Diaz Organization").

15.     Until 2003, defendant Colantonio owned and operated an ICL that had a contractual agreement with Cydcor's predecessor.  Defendant Colantonio was the direct promoter of defendant Diaz's ICL at Cydcor.

16.     The terms of the License Agreement prohibit ICLs from selling goods and services that compete with Cydcor's clients.  Although Cydcor reserves the right to allow other ICLs to sell within the geographical territory of another Cydcor ICL, that ICL cannot sell goods and/or services that compete with Cydcor's clients.

17.     The License Agreement also precludes an ICL from, inter alia, soliciting other ICLs to leave Cydcor.

18.     Credico directly competes with Cydcor.  Credico also provides outsource sales teams to sell goods and services for its clients, some of whom compete with Cydcor's clients.

19.     Defendants Colantonio and Diaz are now affiliated with Credico and act on Credico's behalf.

### CREDICO'S SCHEME

20.     Credico, seeking to increase its presence in the United States, has schemed to hijack the Diaz Organization and other ICLs from Cydcor and bring them to Credico.

21.     Accordingly, Colantonio, on behalf of Credico, has tortiously interfered with Cydcor's License Agreements with the ICLs in the Diaz Organization, including Diaz and other ICLs.  Specifically, Colantonio, working with Diaz, has persuaded Cydcor's ICLs to sell programs that compete with Cydcor's clients within the assigned territories, to recruit salespersons for Credico using Cydcor's online recruitment relationships and discounts, to

sell Cydcor's clients' goods and services on behalf of Credico, to perform unauthorized acts

causing Cydcor's clients to complain to Cydcor and to ignore the ICLs' assigned territories.

22.     In fact, on or about September 6, 2011, Cydcor's Chief Operating Officer

received an email from Raf Diaz's email account (but, apparently, not from Diaz himself)

addressed "Dear Cydcor Executives."  The email states among other things:

> I'm going to disclose information to you that isn't suppose [sic]
> to be known to you but you might already have an idea.
>
> *   *   *
>
> I have sent this e-mail because you guys need to prepare
> properly as well and I'm a strong believer in always do right in
> your life,
>
> Raf is planning on switching all his offices to Credico with his
> former leader Derek he currently has a majority of his offices
> pitching other campaigns other than Cydcor campaigns.
> Which you can easily track through decrease in sales with
> those particular offices that have not switched entirely yet
> because reps have switched to new campaigns.

A copy of the email is annexed hereto as Exhibit "B."

23.     As Cydcor learned of these various breaches of its License Agreements,

Cydcor requested information and interviews from the various ICLs in the Diaz Organization

to understand the scope of these acts and calculate damages to Cydcor.  Cydcor requested

such information and interviews pursuant to the terms of the License Agreements and the

personal guarantees.

24.     Upon receiving these requests, many of the ICLs in the Diaz Organization

elected to terminate their License Agreements rather than comply.  Although the License

Agreements provide that such termination would be effective at least thirty (30) days from

notice of termination, these ICLs refused to provide the requested information during their

respective termination periods and, instead, joined Credico.

25.     The information in the anonymous email quoted at paragraph 22 above proved

to be startlingly accurate.  Cydcor's internal monitoring showed a precipitous drop in sales

activity among the ICLs in the Diaz Organization. In addition, Colantonio and Diaz, on behalf of Credico and with Credico's knowledge and approval, solicited and/or caused other Cydcor ICLs to solicit most of the ICLs in the Diaz Organization, including Diaz, to leave Cydcor for Credico.

26.     Some of the members of the Diaz Organization who initially remained at Cydcor blatantly violated their License Agreements. For instance, an ICL known as Polaris Communications Group ("Polaris") is owned and operated by an individual named Bart Yates. Defendant Diaz promoted Yates and Polaris and they are included within the Diaz Organization. In fact, Diaz's ICL shares the same office space at Yates's ICL. Yates and/or Polaris have abused Cydcor's advertising program (Cydcor is given a steep volume discount) with Careerbuilder.com, an online job recruitment service. Specifically, Yates and/or Polaris placed ads through Cydcor -- thereby utilizing the discounts available for Cydcor's ICLs -- on behalf of companies who are not affiliated with Cydcor and upon information and belief, are affiliated with Credico. These actions are explicitly prohibited under the terms of Cydcor's best practices manual which is made a part of the License Agreement.

27.     Defendant Colantonio, acting on behalf of Credico, had intimate knowledge of Cydcor's agreements and Cydcor's business operations. Colantonio, through Diaz, gained access to the ICLs in the Diaz Organization and was included and participated in regularly scheduled conference calls and meetings held in New York and elsewhere between and among Diaz and the ICLs in the Diaz Organization. Diaz introduced Colantonio to the ICLs in the Diaz Organization as Diaz's original promoter at Cydcor.

28.     Colantonio used his connection with Diaz and his access to the members of the Diaz Organization to persuade Diaz and many ICLs in his organization to breach their contractual obligations, including their non-solicitation obligations, confidentiality

obligations and obligations to provide information to Cydcor upon request.  Ultimately, Diaz and most of the ICLs in the Diaz Organization left Cydcor to join Credico.

29.     In or about late November 2011, Colantonio and Diaz met in a Holiday Inn in New York City at a Thanksgiving holiday party with Elana Stein, who owns and operates an ICL that has a contractual agreement with Cydcor and several other Cydcor ICLs promoted by or otherwise affiliated with Ms. Stein.  During this meeting, Diaz and Colantonio represented to Cydcor's ICLs that moving to Credico would be in their best interests.  Shortly thereafter, Ms. Stein and other ICLs either promoted by Ms. Stein or otherwise affiliated with Ms. Stein terminated their relationships with Cycdor.

30.     The combined revenue by Cydcor represented by the defection of Diaz and the ICLs solicited by Colantonio and/or Diaz totals approximately fifteen million dollars ($15,000,000) annually.

### AS AND FOR A FIRST CAUSE OF ACTION
(Tortious Interference with Contract against Credico, Colantonio and Diaz)

31.     Cydcor repeats and realleges the allegations contained in paragraphs 1 through 30 as if more fully set forth herein.

32.     Diaz, and other ICLs in the Diaz Organization, executed a written License Agreement and Guarantee with Cydcor.

33.     Credico, through its representative Colantonio, was aware of and had actual knowledge of Cydcor's License Agreement with Diaz and the other ICLs in the Diaz Organization.

34.     Credico acted intentionally, maliciously and without justification to induce a breach of the License Agreement between Cydcor and Diaz and the other ICLs in the Diaz Organization who left Cydcor to join Credico.  Among other things, Colantonio induced Diaz, and other Cydcor ICLs to participate in sales programs on behalf of Credico at the same time they were selling on behalf of Cydcor's clients, to sell goods and services for

competitors of Cydcor's clients, to disregard sales territories, to sell Cydcor's clients' goods

and services on behalf of Credico and to induce Diaz to solicit the members of the Diaz

Organization to leave Cydcor and join Credico.

35.     As a result of Credico's improper actions, Cydcor has been damaged in an

amount to be determined at trial.

36.     Credico and Colantonio's conduct is contrary to generally accepted standards

for morality and represents unconscionable conduct.  Accordingly, punitive damages are

appropriate to deter similar future conduct.

## AS AND FOR A SECOND CAUSE OF ACTION
(Tortious Interference with Economic Advantage
Against Credico, Colantonio and Diaz)

37.     Cydcor repeats and realleges the allegations contained in paragraphs 1 through

36 as if more fully set forth herein.

38.     Cydcor has long-standing client relationships with its clients who rely upon

Cydcor to provide outsourced sales teams.

39.     Colantonio and Credico knew about Cydcor's long-term business relationships

with its clients.

40.     Colantonio and Credico intentionally interfered with the business relationships

between Cydcor and its clients by using improper and unlawful conduct that was malicious

and unjustified.

41.     Colantonio and Credico's improper and unlawful conduct has caused Cydcor

clients to diminish their relationships with Cydcor.

42.     As a result, Cydcor has been damaged in an amount to be determined at trial.

43.     Credico and Colantonio's conduct is contrary to generally accepted standards

of morality and represents unconscionable conduct.  Accordingly, punitive damages are

appropriate to deter similar future conduct.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unfair Competition Against Credico)
### (Misappropriation)

44.     Cydcor repeats and realleges the allegations contained in paragraphs 1 through 43 as if more fully set forth herein.

45.     Defendant Credico has misappropriated Cydcor's ICLs in an effort to quickly build economies of scale in the United States while, at the same time, damaging Cydcor's business.

46.     Cydcor ICLs are trained and experienced salespersons.  To become an ICL for Cydcor, an individual must demonstrate excellent sales ability, a high standard of ethics and extensive knowledge of Cydcor's clients' sales programs including pricing and product knowledge.  Cydcor's ICLs have inured to Cydcor's goodwill.

47.     Credico has created an unlawful and improper competitive advantage against Cydcor by misappropriating Cydcor's ICLs, who have been developed and trained through the expenditures and labors of Cydcor.

48.     Credico has misappropriated Cydcor's good will and commercial advantage to compete against Cydcor.

49.     As a result of Credico's acts, Cydcor has been damaged in an amount to be determined at trial.

50.     Credico's conduct is contrary to generally accepted standards of morality and represents unconscionable conduct.  Accordingly, punitive damages are appropriate to deter similar future conduct.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unfair Competition Against Credico)
### (Trade Secrets)

51.     Cydcor repeats and realleges the allegations contained in paragraphs 1 through 50 as if more fully set forth herein.

52.     Credico's poaching of Cydcor's ICLs has enabled Credico to obtain access to Cydcor's highly proprietary, confidential and sensitive strategic business information.

53.     Among other things, Credico has obtained access to Cydcor's client expansion strategies, Cydcor's commission structure, Cydcor's recruiting methods and Cydcor's training materials.

54.     Credico is able to unfairly compete against Cydcor for sales recruits by using its knowledge of Cydcor's recruitment tactics, training program and commission structure.

55.     This information is kept strictly confidential by Cydcor and is not known outside of Cydcor.  Cydcor takes steps to protect its trade secrets, proprietary information and sensitive business strategies.  Accordingly, Credico has obtained an unfair competitive advantage over Cydcor using Cydcor's proprietary information and trade secrets.

56.     Credico's conduct is contrary to generally accepted standards of morality and represents unconscionable conduct.  Accordingly, punitive damages are appropriate to deter similar future conduct.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Cydcor demands judgment against defendants as follows:

(a)     Requiring defendants to pay damages sustained by Cydcor by reason of the acts alleged herein in an amount to be determined at trial;

(b)     Awarding Cydcor pre-judgment and post-judgment interest as well as its reasonable attorneys' fees; expert fees and other costs;

(c)     Awarding punitive damages in the amount ten million dollars ($10,000,000);

and

(d)     Awarding such other and further relief as this Court may deem proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Cydcor hereby demands trial by jury of all issues

that may be so tried.

Dated:     New York, New York          K&L GATES LLP
           December 13, 2011
                                       By: _____
                                             Andrew L. Morrison
                                             Samantha J. Katze
                                       599 Lexington Avenue
                                       New York, New York 10022
                                       Telephone:  (212) 536-3900
                                       Fax:  (212) 536-3901
                                       andrew.morrison@klgates.com
                                       samantha.katze@klgates.com

                                       Attorneys for Plaintiff Cydcor, Inc.

# Exhibit A

# OUTSOURCE SALES LICENSE AGREEMENT

## BASIC TERMS

PARTIES:

Cydcor, Inc.  a Delaware corporation
       ("Cydcor")

3011 Townsgate Road, Suite 400
       (Street Address)

Westlake Village, CA   91361
       (City, State, Zip)

### AND

 Universal Marketing and Consulting, Inc.
       ("Licensee")

 35 West 35 Street, Suite #903
       (Street Address)

New York, New York, 10001
       (City, State, Zip)


DATE OF AGREEMENT:
 June 10, 2009

AREA OF PRIMARY RESPONSIBILITY:

 New York, New York

    These Basic Terms, the Standard Terms, and Owner's Guaranty attached hereto constitute the "Agreement" between Cydcor and Licensee.

Cydcor:
Cydcor, Inc.
a Delaware corporation

By: _____
   Signature

Title: CFO _____

Licensee:
Universal Marketing and Consulting, Inc.
a New York corporation

By: _____
   Signature

Title: President _____

1

## STANDARD TERMS

## RECITALS

A.  Cydcor carries on the business of providing outsource sales services ("Services") for national and regional suppliers ("Clients") of products and services (collectively "Products") contracting with Cydcor.

B.  Cydcor appoints qualified licensees who agree to adhere to the highest ethical and lawful business practices to perform the Services.

C.  Licensee wishes to be appointed as a licensee on the terms and conditions of this Agreement.

## AGREEMENT

1.  *Designation as Licensee.*

(1)  On all of the terms and conditions of this Agreement, Cydcor hereby designates Licensee to provide the Services to sell Products for Clients designated by Cydcor within the Area of Primary Responsibility described on the Basic Terms of this Agreement.

(2)  The term "Unassigned Territory" refers to one or more geographic areas that are proximate to the Area of Primary Responsibility that are not currently assigned to another Cydcor licensee as its Area of Primary Responsibility with respect to the Clients designated by Cydcor to the Licensee.  Upon Cydcor's request or with Cydcor's prior approval, Licensee will also arrange for periodic sales trips by Licensee salespersons, known as, "Road Trips," to provide the Services within the Unassigned Territory for designated Clients.

(3)  This license is non-exclusive.  Without limiting the generality of the foregoing, Cydcor reserves the right from time to time, in its discretion, either temporarily or permanently, to: (a) designate one or more additional licensees to provide Services and sell Products for one or more Clients inside or outside the Area of Primary Responsibility and within the Unassigned Territory, or itself do so, and (b) modify or cancel and subject to sub paragraph (3) of this paragraph the Area of Primary Responsibility to provide Services and sell Products for one or more Clients or generally.

(4)  Except for Road Trips within the Unassigned Area, Licensee will not sell Products or perform Services outside of the Area of Primary Responsibility in an area that is the Area of Primary Responsibility of another licensee, except with such licensee's prior approval, in such licensee's sole and absolute discretion.

(5)  Subject to the limitations and requirements of Clients, as mentioned below in this Paragraph, Licensee will be free to itself determine where, within the Area of Primary

2

Responsibility, Licensee provides the Services and sells Products. Cydcor will not provide leads or locations. Licensee will respect the territorial, customer codes of conduct or other limitations and requirements of Clients in connection with the performance of the Services and the sale of Products for such Clients, as communicated by Cydcor in writing to Licensee from time to time.

(6)     Licensee agrees to diligently use the skills and efforts of its organization to perform its duties under this Agreement.

2.     *Programs.*

(1)     During the term of this Agreement, Cydcor will from time to time provide Licensee with sales programs for one or more Clients contracting with Cydcor for the Services to be performed or the Products to be sold in the Area of Primary Responsibility.

(2)     Licensee will provide the Services and offer and sell the Products through direct sales to businesses and consumers situated in the Area of Primary Responsibility and through permitted Road Trips in the Unassigned Territory. Licensee will not alter any sales forms or applications or marketing or promotional materials that may be provided by Cydcor or its Clients.

(3)     Licensee will not accept orders for or commit Cydcor or any Client to sell Products or perform Services in excess of or different than those Products and Services authorized by Cydcor.

(4)     Licensee will at all times observe Cydcor's and its Clients' marketing and sales rules and all amendments and supplements thereto. Without limiting the generality of the foregoing, Licensee will not make any representations or warranties concerning Products or Services other than those Cydcor and the relevant Client specifically authorize be made by Licensee.

(5)     Licensee acknowledges and agrees that neither Cydcor nor any person acting on Cydcor's behalf has made any promises or representations concerning Licensee's operating and other costs, the business risks attendant to operating Licensee's business, or the revenues or profits (if any) that Licensee may realize as a result of this Agreement.

3.     *Remittances, Compensation of Licensee.*

(1)     Cydcor will pay Licensee commissions ("Commissions") based on amounts actually collected by Cydcor on account of sales by Licensee of Products or the performance by Licensee of Services pursuant to this Agreement in accordance with a Commission Schedule established from time to time by Cydcor and provided to Licensee. Licensee acknowledges and agrees that the Commission Schedule for Services or Products or certain Clients may provide for a holdback on Commissions payable for purposes of the adjustments described in Subparagraph (4), below. Cydcor may, at any time without advance notice, change the Commission Schedule for sales of Products or performance of Services occurring after Licensee has been notified of the change.

3

(2)     Licensee will report all sales daily or for such other reporting period on such forms ("Sales Reports") and in such detail as Cydcor designates from time to time.

(3)     Except upon Cydcor's prior written approval, which it may withhold in its sole and absolute discretion, Licensee will not collect any amounts from customers on account of sales of Products or Performance of Services.  All remittances by customers will be made directly to Cydcor or the applicable Client, in accordance with Cydcor's instructions.

(4)     If Licensee receives commissions on sales that are unpaid or on account of Client rejects, refunds or other adjustments, Licensee will on demand refund to Cydcor the amount of such commissions.  Cydcor may in its discretion deduct the amount of unearned commissions from holdbacks taken by Cydcor or future commissions payable, if any.

4.     *Operation of Licensee.*

(1)     Licensee is not Cydcor's or any Client's partner, agent, franchisee, joint venturer, or employee.  Licensee is an independent contractor and is solely responsible for all costs and expenses of conducting its business, including the business described in this Agreement. Licensee is not a third party beneficiary of any contract between Cydcor and any Client.  Neither Licensee nor the individuals performing services for Licensee are in any way, directly or indirectly, employed by Cydcor or any Client.  Except as expressly provided in this Agreement, Cydcor will not exercise any control over the selection or supervision of Licensee's employees, independent contractors, agents or representatives, all of whom will be Licensee's sole responsibility.  Licensee has no authority to and will not purport to bind Cydcor or any Client to any obligation or liability.  Without limiting the generality of the foregoing, Licensee will be solely responsible for all payroll taxes, income tax withholding, or contributions imposed by Federal and state law with respect to independent contractors and employees whose compensation for services is paid by Licensee.  To assure Licensee's compliance with its obligations under this Agreement, Licensee will at its expense arrange for its payroll to be processed by a third party professional payroll service selected by Licensee and make payroll reports available to Cydcor at any time at its request for inspection and to make copies thereof.

(2)     Licensee will at all times conduct business solely under its own name.  Licensee is not authorized to and will not use the name "Cydcor" or any name, trademark or service mark belonging to Cydcor or any of its affiliates to identify Licensee, in connection with offers and sales of Products, the performance of the Services, or otherwise in connection with any aspect of its business operations.

(3)     Licensee will, at its own expense, maintain one or more suitable places of business in the Area of Primary Responsibility with office and other facilities acceptable to and in keeping with the standards established by Cydcor from time to time.  Licensee will not open additional offices without Cydcor's prior approval.

(4)     Licensee will, at its own expense, maintain a sufficient, trained sales force devoted to the sale of Products and the performance of the Services pursuant to this Agreement.

Licensee will take all reasonable action to ensure that members of Licensee's sales force adhere to the highest ethical and lawful sales practices.

(5)     Licensee will promptly notify Cydcor of all complaints coming to Licensee's attention. Licensee will take no action in connection with such complaints except in accordance with Cydcor's instructions. Licensee will cooperate in any investigation conducted by Cydcor relating to any complaints.

(6)     Licensee will maintain customary books and records in accordance with sound business practices. Licensee will provide to Cydcor copies of customary financial statements in accordance with the requirements of the Manual referred to in Subparagraph (12) of this Paragraph, below.

(7)     Licensee will operate its business, make all sales of Products and perform the Services in a lawful, prudent, reasonable and ethical manner. Without limiting the generality of the foregoing, Licensee will file all required tax returns, and pay in a timely manner all income and other taxes and amounts due to its creditors arising from the operation of Licensee's business.

(8)     During customary business hours, from time to time, Licensee will permit Cydcor and its authorized representatives to inspect Licensee's offices premises and books and records, including tax returns, make copies thereof, and interview Licensee's personnel, to assure compliance by Licensee with this Agreement.

(9)     Licensee will at its cost and expense maintain such policies of insurance with reputable and solvent insurers approved by Cydcor, in such amounts and against such risks, as Cydcor specifies from time to time. Cydcor will be named an additional insured party of such insurance. Upon request, Licensee will provide Cydcor with certificates of coverage evidencing required insurance. All insurance that is required to be maintained by Licensee must provide that it may not be cancelled except upon at least 30 days prior written notice to Cydcor.

(10)    Except with Cydcor's prior written approval, Licensee will not engage in any business other than the business contemplated by this Agreement.

(11)    Licensee will indemnify and hold Cydcor and its officers, directors, shareholders, employees and representatives harmless from and against any and all liabilities, claims, losses, and causes of action arising out of any act or failure to act by Licensee or by any of its contractors or employees. Licensee's indemnification obligations hereunder include Cydcor's legal fees and expenses in the defense of any claim or cause of action.

(12)    Cydcor has developed certain operating standards that are set forth in a manual Cydcor refers to as its "Best Practices Manual." Cydcor may amend and supplement its Best Practices Manual from time to time, by written notice to Licensee, which as so amended and supplemented, is referred to in this Agreement as the "Manual." All such changes and additions will be effective immediately upon receipt by Licensee. Notices of changes or additions to the Manual that are sent via (a) mail will be deemed received 3 business days after being deposited

in the mail or (b) e-mail or facsimile will be deemed received when sent. Licensee acknowledges receipt of one copy of the Manual. Licensee will at all times operate its business in accordance with the mandatory standards set forth in the Manual. The Manual is a part of this Agreement as if fully set forth in this Agreement. Licensee will at all times keep the Manual up to date and in a secure place at Licensee's business premises. The Manual remains Cydcor's property and is lent to Licensee solely for the confidential use of Licensee's executive officers during the term of this Agreement. Licensee acknowledges and agrees that the Manual contains confidential information and trade secrets belonging to Cydcor. Licensee will not duplicate or display the Manual or any part thereof except with Cydcor's prior written consent. Licensee will not disseminate or use the Manual for any purpose other than in connection with the operation of Licensee's business in accordance with this Agreement. Upon termination of this Agreement, Licensee will return the Manual to Cydcor along with any authorized copies that Licensee may have made.

5.    *No Agency.*

Nothing in this Agreement or otherwise will be construed as establishing Licensee as an agent, employee or legal representative of Cydcor or any Client for any purpose whatsoever. Licensee is not authorized to transact business, incur obligations, sell goods, receive payments, solicit orders, or assign or create any obligation of any kind, express or implied, on behalf of Cydcor or any Client, or to bind Cydcor or any Client in any way whatsoever, or to make any promise, warranty or representation on Cydcor's or any Client's behalf with respect to Products offered and sold or Services Performed by Licensee or any other matter, except as expressly authorized in writing by Cydcor. Licensee is not authorized to accept any service of process upon Cydcor or to receive any notice of any nature whatsoever on Cydcor's behalf.

6.    *Terms and Termination.*

(1)    This Agreement will become effective upon its execution by the parties and will remain effective until terminated pursuant to Subparagraph (2) below.

(2)    Except as provided in Subparagraph (3), below, either party may terminate this Agreement without cause at any time by giving the other party at least thirty days prior written notice of such termination.

(3)    Cydcor may terminate this Agreement for cause effective on the date written notice of such termination is given to Licensee, or effective on such other date specified in such notice. Such cause shall include, but is not limited to (a) any material breach of this Agreement; (b) false or fraudulent conduct of any kind by Licensee; (c) violation of any law or regulation relating to consumer protection or safety; (d) conviction of the owner of any felony or any crime involving fraud, theft, violence or moral turpitude; (e) conduct by Licensee that if continued unabated, could, in Cydcor's sole, good faith judgment, cause substantial injury to the reputation or business of Cydcor, its Clients, or any of Cydcor's other licensees; and (f) repeated breaches of one or more provisions of this Agreement that were the subject of prior notice (written or oral) from Cydcor, whether or not such breaches were material.

(4) Upon the termination of this Agreement:

> (a) Licensee will, not later than five business days after the termination date, provide a Sales Report for the period from the date of the most recent Sales Report to the termination date.

> (b) Licensee will immediately return to Cydcor all records including copies embodying Confidential Information, as defined below, or, if so requested in writing by Cydcor, will destroy the same and furnish an affidavit of the owner of Licensee attesting to such destruction.

> (c) Cydcor will, within ninety days after receiving the final Sales Report pay to Licensee any unapplied amounts remaining in Licensee's Adjustment Fund Account, without interest, together with an accounting of the application of any funds in such account.

> (d) Cydcor will not be liable to Licensee for any damages or losses of any kind whatsoever, including lost goodwill, lost profits or incidental or consequential damages resulting from the termination of this Agreement.

> (e) Licensee will, not later than five business days after the termination date, pay all amounts payable to Cydcor that remain unpaid, whether or not otherwise then due.

7.   *Non-Solicitation.*

(1)    Licensee agrees that during the term of this Agreement and for a period of two years after its termination (the "Restrictive Period") Licensee will not directly or indirectly through another person or entity (i) induce or attempt to induce any other Licensee or owner of any other Licensee to terminate its business relationship with Cydcor or in any way interfere with the relationship between Cydcor and any of its Licensees or owners of any of its Licensees and any employee thereof, (ii) hire any person who was an employee or contractor of Cydcor or any of its Licensees during the period of twelve months prior to such event, (iii) induce or attempt to induce any Client, customer, supplier or other business relation of Cydcor to cease doing business with Cydcor or in any way interfere with the relationship between any such Client, customer, supplier, or business relation and Cydcor, and (iv) solicit the business of any entity that was a Client of Cydcor during the period of twelve months prior to such termination. Licensee acknowledges and agrees that the foregoing provisions are reasonably designed to protect Cydcor against Licensee's unfair use of Confidential Information with which Licensee will become familiar during the term of this Agreement.

(2)    Licensee agrees that, both during and after the term of this Agreement, it will refrain from engaging, directly or indirectly, in any conduct or action to damage the name or reputation of Cydcor, its officers, directors, employees, agents or other licensees nor will it encourage, incite or assist, either directly or indirectly, any other person from so engaging.

(3)     If at the time of enforcement of the provisions of Subparagraphs (1) or (2) of this Paragraph 7, a court or arbitrator holds that any of the provisions of such subparagraph are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area.

(4)     Because Licensee has access to Confidential Information, Licensee agrees that money damages would be an inadequate remedy for any breach of Subparagraphs (1) or (2) of this Paragraph 7.  Therefore, in the event of a breach or threatened breach of Subparagraphs (1) or (2) of this Paragraph 7, Cydcor or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violations of the provisions thereof, without posting a bond or other security.

8.     *General Terms.*

(1)     Licensee may not assign or otherwise transfer this Agreement or any right or interest hereunder, voluntarily or involuntarily, without Cydcor's prior written approval.  Cydcor may assign and transfer this Agreement and any or all interests herein upon written notice to Licensee.  Any assignment by Cydcor to a person or entity reasonably able to perform Cydcor's obligations hereunder will relieve Cydcor of any further obligations under this Agreement.

(2)     Cydcor's failure to enforce any of the provisions of this Agreement will not constitute a waiver thereof or of the right subsequently to enforce each and every such provision. No waiver, modification or amendment of this Agreement or of any right or rights hereunder, will be valid and binding unless in writing and signed by the party against whom the enforcement thereof is sought.

(3)     This Agreement is to be governed by and construed in accordance with the laws of the state of California.

(4)     Any dispute arising under this Agreement will be resolved exclusively by binding arbitration in Los Angeles, California in accordance with the Commercial Rules then in effect of the American Arbitration Association.  Each party will bear its own expenses, including legal fees and expenses, in conducting such arbitration.  The arbitrator in such arbitration will have no authority to do any of the following: (a) consider a class action by one or more Licensees, including Licensee, (b) award punitive or special damages to any party, (c) award attorneys' fees and costs of arbitration, (d) grant any remedy to Licensee other than monetary damages actually suffered by Licensee; and (e) grant any relief to Licensee on account of any claim that was not asserted by Licensee pursuant to the provisions of Subparagraph (5) below.  The award of the arbitrator may be enforced in any court of competent jurisdiction.

(5)     Any claim by Licensee arising from or pursuant to this Agreement must be made in writing not later than (a) ninety days after the facts upon which such claim is based were known to Licensee or would have been discovered by Licensee through the exercise of reasonable diligence or (b) twelve months after the occurrence of such facts, which ever time

8

first occurs. If the parties are unable to amicably resolve any claim made by Licensee, Licensee must commence an arbitration proceeding pursuant to Subparagraph (4) of this Paragraph not later than twelve months after the first to occur of (a) or (b) of this Subparagraph (5). Any claim not timely made by Licensee within the periods set forth in this Subparagraph shall be deemed irrevocably waived by Licensee.

(6)     This is the entire agreement between the parties concerning the subject matter hereto and all prior understandings with regard thereto, whether oral or in writing are merged herein. There are no other contemporaneous agreements.

(7)     In the event any provision of this Agreement is held to be invalid, said provision will be severed from this Agreement to the extent of such invalidity, without invalidating the remaining provisions of this Agreement.

(8)     Any matter requiring Cydcor's approval or the exercise of discretion by Cydcor may be approved or exercised by Cydcor in its sole, subjective discretion.

9.     *Confidentiality.*

(1)     During the term of this Agreement and for a period of five years thereafter, Licensee, its owner, contractors and employees, will hold in confidence all non-public business information in connection with the performance by the parties of their obligations and their exercise of rights under this Agreement, including, without limitation, all marketing and promotional programs and plans, financial information, customer lists, lists of Clients or any other trade secrets or proprietary information whether now existing or hereinafter developed which gives the disclosing party any competitive advantage over those who do not know or use it ("Confidential Information"). Confidential Information does not include information that (a) is or becomes generally available to the public through no fault of Licensee; (b) must be disclosed to governmental agencies or other third parties to the extent reasonably necessary to achieve the purposes of this Agreement; (c) can be demonstrated that the information was known to Licensee prior to entering into this Agreement; (d) is disclosed pursuant to the order of a court, administrative agency or other governmental body, provided, that Licensee notifies Cydcor of such order sufficiently in advance to allow Cydcor to seek a protective order from a court.

(2)     Confidential Information may not be used by Licensee, its owner, or any contractor or employee for any purpose other than for the performance of Licensee's obligations under this Agreement.

(3)     Licensee will treat the Confidential Information in strict confidence and treat it with the utmost care and highest good faith, disclosing it only to such of its employees as necessary to use it as permitted by this Agreement. Licensee will advise each such employee of the confidential and proprietary nature of the Confidential Information and will cause such of its employees and contractors to execute non-disclosure agreements in form prescribed from time to time by Cydcor.

9

(4)     The parties acknowledge that Cydcor is the sole owner of the Confidential Information.

(5)     Due to the valuable, special and unique nature of Confidential Information, it is agreed that irremediable harm would result and that money damages would be inadequate to compensate Cydcor for any breach of this Paragraph 9.  Accordingly Cydcor will be entitled to obtain a temporary restraining order, and permanent injunctions, an order of specific performance or other comparable equitable relief from any court of competent jurisdiction without filing any bond or undertaking for any such relief.

10.     *Owner's Guaranty.*

To induce Grantor to enter into this Agreement, Licensee's owner has executed the Owner's Guaranty attached hereto.  Execution and delivery to Cydcor of the Owner's Guaranty is a condition to the effectiveness of this Agreement.

- End of Standard Terms -

## OWNER'S GUARANTY AND AGREEMENT

The undersigned ("Owner") is the sole shareholder (if Licensee is a corporation) or member (if Licensee is a limited liability company) of Licensee and gives this Owner's Guaranty ("Guaranty") to induce Cydcor Inc., a Delaware corporation ("Cydcor") to enter into the attached Outsource Sales License Agreement ("Agreement").  OWNER UNDERSTANDS THAT SIGNING THIS GUARANTY AND AGREEMENT INVOLVES PERSONAL LIABILITY.

1.     Owner hereby absolutely and unconditionally guarantees the full, prompt and complete performance of Licensee under the Agreement, as and when the same become due. Owner agrees that, without obtaining Owner's approval or otherwise giving notice to Owner, the terms of the Agreement may be modified or extended and the obligations created by the Agreement may be compromised, settled or adjusted without impairing or otherwise affecting Owner's obligations under this Guaranty.  This Guaranty is irrevocable, absolute and unconditional.  No delay or failure by Cydcor to exercise any right or remedy hereunder or under the Agreement will operate as a waiver thereof or preclude any other or further exercise of any right or remedy.

2.     Owner hereby agrees that in the course of operations of Licensee, Owner will have access to Cydcor's Confidential Information (as such term is defined in the Agreement). To protect Cydcor's rights to Confidential Information, Owner agrees to be personally bound by the provisions of Paragraphs 7 and 9 of the Agreement as if such provisions were restated in their entirety herein and applied specifically to Owner.

3.     Cydcor has entered into the Agreement in reliance upon Owner's controlling ownership interest in Licensee and Owner's full time participation in and management of Licensee's day-to-day operations.  Accordingly, to induce Cydcor to enter into the Agreement, Owner agrees to devote his full working time to the management of Licensee and not to transfer

10

any ownership or other economic interest in Licensee without Cydcor's prior approval, which Cydcor may withhold in its discretion.

4.     This Guaranty and Agreement is enforceable without Cydcor having to proceed first against Licensee and shall be effective irrespective of the solvency of Licensee.  This Guaranty and Agreement will survive and be unaffected by the termination or assignment of the Agreement or any change in ownership of Licensee, whether or not such assignment or change in control is made with the approval of Cydcor. Owner hereby waives and agrees not to claim or enforce any right to be subrogated, in whole or in part, to any right or claim of Cydcor against Licensee unless and until all obligations with respect to which Owner is liable hereunder have been paid in full or discharged to the satisfaction of Cydcor.

5.     This Guaranty and Agreement may only be amended in writing, signed by Owner and accepted by Cydcor.  Owner acknowledges, represents and warrants that no person has made any promises or representations to Owner to induce Owner to sign this Guaranty.  This Guaranty is to be interpreted under California law.  Any dispute arising under this Guaranty must be resolved exclusively by binding arbitration in Los Angeles, California in accordance with the Commercial Rules then in effect of the American Arbitration Association.  Each party is to bear its, his or her own expenses, including legal fees, in connection with such arbitration.  The arbitrator in such arbitration will have no authority to (a) consider a class action by one or more persons, including Licensee and Owner, (b) award punitive or special damages to any party, and (c) award attorneys' fees and costs of arbitration.

_____
Signature of Owner

Rafael Diaz
_____
Name of Owner

Date: 06/16/09

Accepted by Cydcor Inc., a Delaware corporation on this 22 day of Jun 2009.

By: _____

Title: CFO

152766.4

# LETTER OF AUTHORIZATION

11

_____ **to CYDCOR, INC.**

(ICL NAME)

Dear Sirs,

## RE:    Our Outsource Sales License Agreement with you

Further to our entering into the Outsource Sales License Agreement with you, we hereby authorize Cydcor, Inc., its affiliates and subsidiaries, and their respective officers, directors and employees to:

    a)      receive and provide, at Cydcor's request and in its discretion, any financial, payroll, operational and business information in any way relating to our company from and to our Hub Manager/Bookkeeper from time to time during the term of our Agreement with Cydcor, Inc.; and

    b)      discuss and review , at Cydcor's request and in its discretion, any financial, payroll, operational and business information in any way relating to our company with other companies in a contractual relationship with Cydcor, Inc., its consultants, its representatives and business associates; and

    c)      to publish and distribute in its promotional material, including bulletins, websites and other media, at its discretion, the performance and standing of our company in relation to other companies with which Cydcor, Inc. has business relations.

This shall be your good, sufficient and irrevocable authority and direction with respect to each of the foregoing matters.

Yours truly,

ICL Name

Per: _____

Signature

Name and Title

12

# Exhibit B

**From:** Raf Diaz [mailto:diazraf5@gmail.com]
**Sent:** Tue 9/6/2011 7:12 AM
**To:** Vera Quinn
**Subject:** Raf Diaz's PMG Organization

Dear Cydcor Executives,

This is a e-mail to inform you of Raf Diaz's plan effective after the R&R event taking place it two weeks. I'm going to disclose information to you that isn't suppose to be known to you but you might already have an idea. There's no point in following up this information with me as I will have to deactivate this account to protect myself and my future as I don't know what could possibly be done. I have sent this e-mail because you guys need to prepare properly as well and I'm a strong believer in always do right in your life,

Raf is planning on switching all his offices to Credico with his former leader Derek he currently has a majority of his offices pitching other campaigns other than Cydcor campaigns. Which you can easily track through decrease in sales with those particular offices that have not switched entirely yet because reps have switched to new campaigns. Bil Victolee, already has switched over everything as you have been aware. Now have are pitching two campaigns such as PPU, UN and the Cell Phone company.

However not only will he be switching his offices his sweet belle Alana will be as well with all her office also some of Julia Edmunds offices, And of coarse eventually Julia Edmunds after she realizes her crew has made the switch.

This is the plan for after R&R as many offices have slowly transitioned now and still wanted to attend the event. The last memory of Cydcor.Way to walk out with a bang, I don't know if this is viable information but as I am sure you have heard the saying you don't shit and eat out of the same plate far too many of the PMG owners have as they are the black sheep of Cydcor and I despise the idea of leaving to join another broker after all of the support that Cydcor has provided.